Case number 23-1165, Coalition to Stop CPKC Petitioner v. Surface Transportation Board and United States of America. Mr. Wilcox for the petitioner, Mr. Vanden Heuvel for the respondents, Mr. Wall for the intervener. All right, Mr. Wilcox, good morning. Good morning, Judge Henderson, Judge Garcia, Judge Rao. First, I'd like to point out we have several officials and first responders here from the affected Chicago cities here this morning. Secondly, I'd like to raise a few initial points, but primarily I want to try to answer your questions while I'm up here. So, Chicago, one of the busiest railroad hubs in the world, a critical segment of the Merge Railroad runs through the coalition communities. These already had mile to two mile long freight trains running through their communities, three per day. They've already dealt with the, they deal with the impacts of these. Excuse me? Mostly at night. Well, they're supposed to, but there is, there's evidence in the record that sometimes they don't, that they do run during the commuter hours, but they're supposed to, yes, pursuant to their agreement. So, because of the transaction, we're going to, there's going to be eight trains in addition, 11 total. Currently, they're up to six since the merger was implemented. So, even if one was to accept the decision's numbers, if the average train is 6,817 feet, 11 trains that size is 14, over 14 miles of trains every day through these communities that have 30 road crossings, 24 pedestrian crossings. And yet the NEPA analysis of the would be quote unquote negligible, minor, and or temporary. Mr. Wilcox, why are traffic impacts part of NEPA analysis? So, NEPA requires agencies to think about the environmental effects on the human environment. So, there are some instances in which maybe traffic is connected to pollution or some type of environmental harm, but here I take it the coalition's position is just sort of the traffic in itself, the nuisance from the traffic. There's not really any connection between traffic and environmental harms. I mean, why is that even something that should be a part of NEPA analysis? And here the agency did, it might not be impermissible for the agency to consider traffic, but I mean, maybe they don't even have to look at traffic in conducting an environmental impact. Well, yes, and I was interested to see TPKC. I was wondering if they were appealing to that part of the board's decision, but that is, and historically has been the STB's treatment of NEPA in all of their mergers, rail construction projects. And I think it comes down to societal impacts, safety. Sure, so it's part of the public interest inquiry, but maybe not the NEPA inquiry. Well, it's an environmental, it's the social environment, the overall community environment. So, yes, I agree that it has more of a social component, but that is how the board, I guess the critical issue here is that's how the board other safety issues, OEA is the place to bring those through the EIS process. So we had, there's three key points I wanted to raise. First, the board refused to incorporate any of the baseline data, the existing delays, the existing road crossing delays, the type of data that already the coalition communities were experiencing from the three trains that came through daily. And then the second thing is they completely, they underestimated the future delays by assuming the way the problem. Instead of measuring the crossings on eight additional trains of 7,000 to 10,000 feet, they created this weighted average train, a hypothetical train of 1,960 feet long. And then they assumed speeds, you know, maximum available speeds or, you know, the maximum desired speed are determined different ways in the EIS. And that, the result of those two components, because as, you know, the general calculation for crossing delays is the length of the train, the speed it's going, and then how long it takes the gate to go up and down. And their study didn't include stop trains in terms of the delay study. Now, they later had a stop train component when they were looking at, they did a special study, not a special study, but they did an additional analysis for first responders in the EIS, but they did not use stop trains in the delay analysis. And so the result was an EIS that showed, you know, substantially understated the crossing delays. And that flowed through the rest of the analysis in terms of crossing safety, wide zones, you know, they had concluded that the eight additional trains would not have an impact because it based on the weighted average, they would just flow through the crossings in a matter of seconds. And finally— Mr. Wilcox, I mean, I understand that the coalition has a number of objections to how the STB conducted its analysis here, but how do these arguments go beyond fly specking? I mean, the board here did a very comprehensive study and, you know, perhaps it's not perfect, but that the point of NEPA is to have an informed decision. And they took a very close look at everything. So what about your argument goes, you know, beyond fly specking the agency's work? Well, they have to—the analysis has to be based in reality. It has to be reasoned. It has to, you know, match with what the reality is on the ground. And so the—particularly the delay analysis with the short trains moving really fast, that's just not rational. And so—and yes, they have a lot of explanation and responses, but the response was, this is how we're doing it. And so it's the rationality carried forward. And that's the coalition's point, is that the analysis should have been more thorough. And instead of weighting the average against all the passenger trains that should have measured the impact of the eight and then, you know, total 11 freight trains up to two miles long, there's a vast difference. So what about the delays caused by the freight train isn't captured in a weighted average? I mean, I would think that is, as it suggests, capturing the impact of the average length of the train that's coming through. Obviously, a two-mile-long freight train is going to cause a greater delay. But in terms of just looking at the aggregate impact that this is going to have, I'm struggling to see why the average is inappropriate. Well, the average is inappropriate because that's not how the trains come through. They don't come through on the average, you know, 24 hours, as Judge Henderson pointed out. You know, they come out—come at different times. And so a 10,000-foot train by itself has a huge impact. And if you have a weighted average spread out, a 10,000-foot train doesn't come through in 1,960-foot increments over a period of time that you can all add up and they maybe match the first, you know, of the 10,000-foot train. But nevertheless, a 10,000-foot train slowly moving through a crossing or stopped at a crossing is a huge impact. And when you almost quadruple the current impact, it's a very large impact. And so our view is the weighted average just sort of, you know, assumes it away or, you know, spreads it out, hides the real impact of the trains. So one way to make this more concrete, maybe, would be you think they should have grappled with the idea that there could be an ambulance stuck on the other side of the track when it needs to be on the other side for 5 to 10 minutes, and that's obscured by a weighted average? That is obscured by the weighted average. Is that kind of the most important impact that you have in mind here? Yes, that's obscured by the weighted average. Yes. And I'm—see, I'm like minus 10. Should I stop talking? We'll give you a couple minutes and reply. Okay. Thank you. We'll give you a couple minutes and reply. Okay. Thank you. Good morning, Your Honors. May it please the Court. The EIS in this case was reasonable and represents far more than a hard look crossing the leg. On top of an already massive EIS, the Board spent dozens of pages addressing the coalition area specifically and specifically responding to the coalition's comment. Nothing the coalition said was ignored and nothing that the Board did was arbitrary. The Board used well-sourced data that was specific to every intersection that it studied, and it used established, well-known formulas that the coalition does not even attack. I don't see, frankly, any error in what the Board did, but even what we're talking about in this case is really fiddling at the margins and flyspecking. Fundamentally, this was a close look, a hard look at crossing the leg and other issues in this case, so the petition for review should be denied. Just to pick up on a couple of topics that were discussed earlier, I think, Judge Henderson, you're absolutely correct that the trains are generally not going to be scheduled to run during rush hour, which is when, of course, most of the delays to vehicles are going to occur. What about Mr. Wilcox saying it doesn't work that way? That's at least what I heard his answer. I think the evidence in this record suggests that it generally does work that way. There's a contractual commitment that the TPHC has made with METRA that they will not interfere with METRA trains during rush hour, and CPKC has committed on the record that the new trains will not be scheduled during rush hour. There is some evidence that some small percentage of trains historically have technically entered the line during peak METRA hours, but that's generally going to be something like a tail end of a train over on the end of the line at Bensonville Yard, which is a rail yard to the east of the coalition area that's used for a lot of different other tracks. So that might be a train moving north of the coalition line technically moves onto that part, but it's not going to be traversing the entire length or interfering with any METRA trains or causing any block crossing delays. As to the emergency responders, Judge Garcia, the board did consider what it looks like to be in an specifically by train type how long an average delay is going to be. So if you arrive at the beginning of a 10,000 foot train moving by on average, you're going to be waiting 3.4 minutes. That isn't disclosed, but of course the trains on average are not going to be that long. They're going to be substantially shorter, and the board took that into account, and I think that it was reasonable for the board to conclude that in aggregate these delays are relatively minor. Jennifer, I'm interested in why does the Surface Transportation Board take into account traffic in its NEPA analysis? It seems like it would certainly be part of the public interest analysis, you know, balancing the effects on the community, you know, before taking a merger or something like that, but why is it part of the NEPA analysis? So I don't think that the board has ever been squarely confronted with that question. I can't point you to any board statement where they explain why they do it or take a position on whether it is required by NEPA. I can tell you that historically the board has done a crossing delay analysis in merger cases and construction cases where it's required, so that they have treated it as part of the EIS, but I don't know whether or not, I don't know what the board would say if it was like squarely in front of them, like whether they absolutely need to. It typically does consider that. It typically does, and of course it did in this case. Yes. And it also considered it for the delay element of it, but also it was relevant to safety in terms of first responders, and of course under the CEQ regulations that were in effect at the time of this decision, safety was considered a NEPA harm to staff. Oh, right. One of the other things Mr. Wilcox says is that the assumption that these trains, with some exceptions, are going to be moving at maximum speed is just unrealistic. What's your response to that? Is it based on actual train speed data, and was there some accounting for, I think, the obvious fact that occasionally trains are stopped? There was. I'll take the second part of that question first. There was an accounting for the fact that sometimes trains are stopped. The board acknowledged that that can happen, although it is unpredictable and rare, but because of that possibility, the board assessed for a good, like hundreds of these crossings, all of, I think, 20 crossings in the coalition area, of what would happen if a train came to a complete stop, what is the shortest distance around the train, and two miles in either direction if that were blocked. So of course there are no four mile long trains, but that's to account for the possibility that, you know, what if the front of the train blocks the crossing versus what if the rear of the train, and the EIS disclosed what the shortest distance was in all of those cases. In the coalition area, I think the longest, there was one where it's a 7.5 mile detour, in other cases it was shorter, and that was something that the board took into account in its analysis. I don't understand the coalition to actually have any substantive criticism of that aspect of what the board did. In terms of the speeds themselves, I would submit that, like, timetable data is data. It's not historical, like, empirical data in the same way, but it does tell us how fast we expect the trains to go. The coalition's argument on this point, it speaks very much in generalities. They want us to infer that the Chicago area in general is very crowded, so therefore this line must be very crowded, but that's just not what the evidence in this case suggests. You can see on the map on page J, A500, that this area, this particular line, is actually far less crowded than other parts of Chicago. Only two railroads run here, and one of the metra is very much confined to just these two rush hour windows. Outside of those windows, they run at most one train per hour in either direction, and basically no trains at night. So that leaves a lot of room for CPKC freight trains to go in those hour-long slots between the metro trains or, again, at night. It's possible for, you know, as many as 30 trains to run this line, this discussed on page J, 115, without even really encountering a metro train. So there's no reason to expect that these trains wouldn't be moving at the speed that the railroads desire them to operate at. There's not really an idea, like, bumper-to-bumper traffic that you might be picturing, like, with cars. That doesn't really happen in the train world, right? Trains take a while to get moving, and then they move generally at that speed, especially when there's not, like, more than one train on the line, and when there are double tracks so they can move past each other. It's a very fluid network. There's no reason to expect that these timetable speeds wouldn't be, you know, a reasonable approximation of how fast the trains are actually going. Let me ask you about the village of Barrington. It seemed to have a lot more extensive Chicago-specific meetings and traffic studies. So it's true—I see my time's expired, but—it's true that there were more meetings specifically in Chicago, but I think that that's just a function of the fact that only the Chicago area was at issue. This was a, geographically speaking, much larger merger, and, I mean, frankly, the technology had developed in the intervening time where video meetings were just, like, more common and possible. So I don't think there's any allegation that the public wasn't able to participate in an effective way in this case. In terms of the actual substantive analysis, in general, the board applied the exact same approach. It used the same level of service type model in the EJ&E case as it did here. In that case, it revealed some great delays. I mean, here, every level of service was an A in either of the scenarios. In that other case from 2008, I mean, there were some crossings that I think it was, like, going from, like, Cs to Ds or even less, and we're talking about tracks that had, you know, 10 or more trains initially, and we're adding 20 trains to it. It's just, like, a different magnitude. So we did that exact same study. In that case, we did an additional study on top of that when a party asked for it. But in this case, there was no need for that study because there was no demonstrated harm and, most importantly, no party asked for it. I mean, this is not something that anyone, including the coalition, described in the comment on the draft EIS. So that would be forfeited either way. All right. Thank you. Thank you. Judge Henderson, and may it please the court. All parties now agree that this court should not attempt to unwind this merger. The only question is whether the board needs to say more about the merger's environmental effects on a 20-mile segment of a more than 8,000-mile track. The board studied the effects on that coalition line exhaustively and reached the reasonable, indeed correct, conclusion that the merger would not unduly delay drivers or metro trains in the coalition communities. The board therefore approved a transaction that has had a host of public benefits and that has not caused any apparent issues in the coalition communities. The court should deny their petition. I welcome the court's questions. I have a question that doesn't have to do with the merits, but, and I think you're covered in your brief, but in the red brief on page eight, the STB notes that the coalition line freight trains have decreased where the volume of freight on most other lines have increased. What caused that? I think what they're talking about there is the delays on the line, and the delays have gone down because of some of the improvements that were made in Bensonville Yard and on the Marquette subdivision. And so, you know, the board was making a predictive judgment that I want to, there are not great delays going in pre-merger. We're talking about one out of 100 metro trains that gets delayed by more than six minutes by a freight train. Basically, the board said, we think that's actually going to be better because of the improvements that are going to result around this merger. And the numbers have actually shown that that's right. We didn't rely on that, by the way, for our merits arguments. We did rely on it for the remedy because I do think it's very important that the court understand that it does not, even if it sees some problem with the board's analysis, which I don't, this looks like a level agency work to me, not even B or C, A level. But if the court sees any problem with what the board did, it's important that it not vacate the approval of the merger and disrupt a company that's been operating as a merged entity for two years, given that even petitioner recognizes that the board could fairly easily fix any error it finds by just saying more about the environmental effects. I was interested in the suggestion in CP Casey's brief about whether traffic is properly considered part of NEPA, but I am wondering if that issue is one we can even reach, given that it was only raised by the intervener brief. So we're a party here. I think the court could reach it. I don't think the court needs to, because if the court concludes, which it should in our view, that the various effects here were properly considered, then even if the board didn't have to consider them, no harm, no foul, it's just an over-inclusive opinion. I think the court would only reach it if it thought the board didn't do a good job in considering the grade crossing delays or the risk to safety. Obviously, Judge Rao, I do think there are questions about whether everybody's been reading NEPA the right way. It's all based, as far as I can tell, on this early 1972nd Sergey case. And in the interim, you have the Metropolitan Edison opinion from the Supreme Court, which says at pages 772 and 773, it says physical environment, not once, not twice, but three times, and indeed rejects what I think is basically an argument there that you can consider this broader sort of social or human environment. And the court says, no, we look at physical environment. That's what it says three times. So I do think that we are in a very odd situation where we're not considering for NEPA purposes like the delay to commuter trains, but we are considering the delays to motorists. I understand that in a world where you're saying that all those motorists are sitting there so long that they're contributing emissions to the environment or something like that, but that wasn't the argument here. It's never been the argument. So I don't think that properly understood the board needs to be looking at all of this under NEPA. For public interest purposes, under the ICCTA, yes. Before it approves the transaction, absolutely. For NEPA purposes, no. But I don't think the court needs to reach it here if it agrees with all of those. Thank you. Thank you. Thank you. Just very quick. I want to address the table issue that respondents mentioned. Table H22, that's the one where the first responders, you mentioned the longer trains and the time for the first responders to go around. Again, that table was dropped into the EIS. It's not part of the draft EIS. And the longer trains that they used to determine this alternative route was never applied to the delay study that they based their decision on. There was no impact. If the table H24, which is at JA870, reverts back to the weighted average trains. And in terms of the stop trains, the board mentioned stop trains at JA813 and JA859, saying that, yes, trains stop. And they say it's rare, but they never asked anybody how often that happens. And then the stop trains, which they use to determine if a train is this long, how long does it take to drive around it, they never factored into the delay analysis what that stop train did to the analysis. Because their analysis determined or was based on the fact that trains were always moving. And so it gets the first responders analysis, it adds, but that analysis was also based on short trains moving or actually longer trains, okay, for that particular analysis, but they were also moving at top speed. In terms of the meetings, I thought it was interesting. I see my time is ready. That, you know, the video conferences, and it's the new thing. But you had several board members go all the way to Houston, Texas, to talk to the local community there and officials there about congestion in Texas. And so this whole proceeding and the coalition from the very start was, you know, waving their hands and saying, come to Chicago, do some additional analysis, do some, you know, don't use these general models, you know, come in and do specific because it's a result, in our view, is an irrational conclusion from the EIS. Thank you. Thanks very much.
judges: Henderson; Rao; Garcia